## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

COLLEEN GRIFFITH,

individually and on behalf of all others similarly situated,

                      Plaintiff,

    vs.

H&R BLOCK, INC., and
H&R BLOCK TAX SERVICES LLC,

                  Defendants.

CIVIL ACTION NO.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Adam Smith, in the *Wealth of Nations*, wrote: "We rarely hear, it has been said, of the combinations of masters, though frequently of those of workmen.  But whoever imagines, upon this account, that masters rarely combine, is as ignorant of the world as of the subject.  Masters are always and everywhere in a sort of tacit, but constant and uniform, combination, not to raise the wages of labour above their actual rate."[1]  One form of employer combination that is particularly harmful to workers is the "no-poach" agreement, in which a group of employers agree that they will not hire or

---

[1] ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS (1776), https://www.gutenberg.org/files/3300/3300-h/3300-h.htm.

Case 4:19-cv-00470-ODS   Document 1   Filed 11/13/18   Page 1 of 28

solicit one another's workers. These are often contained in a company's franchise agreements, requiring the individual franchises to agree not to hire or solicit workers from other franchises of the same company. Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude that "[a]greements to refrain from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts," that those no-poaching agreements can limit turnover, reduce labor market competition, and reduce workers' job opportunities, and that the prevalence of no-poaching agreements may help to explain why wage growth has been sluggish despite low unemployment.[2]

Plaintiff Colleen Griffith is a former H&R Block employee who brings this class action on behalf of herself and the proposed class (defined below) of all other similarly-situated current and former H&R Block employees against Defendants H&R Block, Inc. ("HRB"), and H&R Block Tax Services LLC, (together, "Defendants" or "H&R Block") for H&R Block's anticompetitive policy enforced on both its franchised and company-owned tax offices that prevented any H&R Block franchise from hiring or soliciting current employees of any other H&R Block franchise or company-owned tax office, and prevented H&R Block company-owned tax offices from hiring or soliciting current employees of H&R Block franchises (the "No-Poach Clause"). Plaintiff alleges that this no-hiring and no-solicitation agreement was an illegal conspiracy between H&R Block and its franchises in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages and injunctive relief, demanding a trial of jury of all issues so triable. The allegations contained in this Complaint are based on Plaintiff's personal knowledge as to Plaintiff's own conduct and upon information and belief or based on the investigation of counsel as to all other matters:

---

[2] Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018), at 20-1.

# I.     INTRODUCTION

1.     H&R Block required all of its franchisees to sign a franchise agreement that included a clause stating that they would not solicit for employment (1) any H&R Block employee, including employees of H&R Block company-owned tax offices, or (2) any employee of another H&R Block franchise. H&R Block's company-owned tax offices were also subject to this clause, and they could not solicit employees of H&R Block franchises. This no-solicitation agreement is *per se* illegal under the federal antitrust laws.

2.     H&R Block is the largest consumer tax preparer in the United States, providing tax preparation services at approximately 10,000 tax offices in the United States. Roughly two-thirds of Defendants' tax offices are corporate-owned; the rest are franchises.[3]

3.     H&R Block receives profits from its franchises primarily through charging royalties on the franchises' gross revenue. Opening a new H&R Block franchise costs from approximately $30,000 to $150,000,[4] with the variation primarily depending on the cost of the real estate and what construction is necessary.

4.     H&R Block's franchise agreement, which franchisees are required to sign, included a clause prohibiting any H&R Block franchise from hiring any employees of H&R Block, including its corporate-owned tax offices, or employees of other H&R Block franchises. This clause (the "No-Poach Clause") provides as follows:[5]

> "During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent. . . .[s]olicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block;"

---

[3] H&R Block, Inc., Annual Report (Form 10-K) (June 15, 2018).
[4] H&R Block, Inc., Franchise Disclosure Document (July 27, 2018) ("2018 FDD").
[5] H&R Block, Inc., Franchise Disclosure Document (July 28, 2017) ("2017 FDD"), Franchise Agreement, Section 12.2(A)(3).

5.      Since H&R Block's franchise agreements were standardized, and franchisees knew that the franchise agreements were standardized, each franchisee knew that other franchisees were subject to the same franchise agreement and subject to the same No-Poach Clause.

6.      While the No-Poach Clause prohibits franchisees from soliciting one another's employees, the No-Poach Clause also explicitly prohibits them from hiring employees of the HRB corporation itself, including employees of the two-thirds of HRB retail locations that are owned by the HRB corporation.  Additionally, HRB corporate-owned locations cannot hire or solicit employees of HRB franchises.  This means that all of HRB's locations are subject to the No-Poach Clause.

7.      Since the No-Poach Clause was contained in the franchise agreement with HRB that was mandatory for franchisees to sign, and since company-owned locations also followed it,  it was a collusive policy between HRB and its franchises that allowed all H&R Block locations, whether corporate-owned or franchised, to reduce turnover and suppress wages, making them more profitable, and increasing HRB's profits from its company-owned tax offices as well as the franchise royalties that it received.

8.      The franchise agreement also gave HRB the right to terminate franchisees' right to operate their franchises in the event that they violated certain provisions of the agreement,[6] including any violation of the No-Poach Clause.[7]  This meant that franchisees were compelled to follow the No-Poach Clause or risk immediate termination.

9.      The No-Poach Clause is an unreasonable horizontal restraint of trade that is a *per se* violation of the Sherman Act, Section 1, 15 U.S.C. § 1.  The Department of Justice's Antitrust Division and

---

[6] 2017 FDD, Franchise Agreement, Section 13.
[7] 2017 FDD, Franchise Agreement, Section 13(M).

4

the Federal Trade Commission cooperated on the publication *Antitrust Guidance for Human Resource Professionals*, which states: "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[8] This document also states that "firms that compete to hire or retain employees are competitors in the employment marketplace...[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[9] This definition of an illegal no-poach agreement covers the No-Poach Clause.

10.     The No-Poach Clause and similar agreements reduce competition for employees, which has the resulting effect of reducing turnover, employee choice, mobility, and wages. This reduces employees' bargaining power both with their current employer and with other potential employers subject to the same No-Poach Clause.

11.     The purposes of the No-Poach Clause are to reduce turnover and suppress H&R Block's employees' wages by eliminating competition between H&R Block locations for workers, at both franchises and corporate-owned locations. Without a No-Poach Clause, locations would raise wages to attract each other's workers, locations would often have to raise wages and improve conditions to keep their own workers from seeking to work for other locations, and a worker at one location could seek higher-paid or higher-level positions that opened up at other locations. The No-Poach Clause greatly reduced or eliminated all of those possibilities and resulted in reducing turnover, employees' wages, benefits, working conditions, job mobility, and job choice versus what they would have been in an open market, benefitting H&R Block and its franchises at the expense

---

[8] U.S. DEPT. OF JUSTICE, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download, at 3.
[9] *Id*, at 2.

Case 4:19-cv-00470-ODS   Document 1   Filed 11/13/18   Page 5 of 28

of H&R Block employees.

12.     Plaintiff and members of the Class are current and former employees of H&R Block and/or its franchises, who allege that H&R Block's imposition of the No-Poach Clause, and collusion with its franchisees to implement and enforce it, proximately and foreseeably caused Plaintiff and other Class members to experience suppressed wages, fewer benefits, worse working conditions, and reduced choice and mobility as to work location.

13.     Since (1) the No-Poach Clause is part of H&R Block's franchise agreement, which is not disclosed to tax office-level employees, (2) for H&R Block's corporate-owned locations, the No-Poach Clause is part of H&R Block's internal policies, which are not disclosed to tax office-level employees, and (3) the No-Poach Clause is not mentioned in H&R Block's or its franchises' employee agreements or other employee materials, H&R Block employees are not made aware of the No-Poach Clause.  For H&R Block to deny H&R Block employees the knowledge that the No-Poach Clause was operational was fraudulent concealment, and also withheld information that would have been material to their decision on whether to accept a position with an H&R Block tax office at the time of hiring, had they known that the No-Poach Clause would have a significant negative effect on their wages, benefits, working conditions, upward mobility, and choice of locations at which to work.

14.     Defendants' anticompetitive actions in imposing the No-Poach Clause on H&R Block franchises and corporate-owned locations and colluding with H&R Block franchises to enforce it has damaged Plaintiff and members of the Class.  Plaintiff seeks treble damages, injunctive relief, and reasonable attorneys' fees and litigation costs on behalf of herself and the Class under the Sherman Antitrust Act, Section 1, 15 U.S.C. § 1.

6

## II.    JURISDICTION AND VENUE

15.    Plaintiff brings her claim under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a). Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have agents, and/or can be found in this District.  HRB has 40 locations within the Chicago city limits alone[10] in addition to others in this District.[11]

16.    This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.  This Court has specific jurisdiction over Defendants because they transact business in this District and committed overt acts in furtherance of their conspiracy in this District, and Plaintiff's claims arose out of that conduct.

17.    Further, Defendants' anticompetitive actions were directed at the United States, including in the Northern District of Illinois, and were intended to cause and did cause injury to persons in the United States, including in the Northern District of Illinois, and Plaintiff's claims arose from Defendants' anticompetitive actions.

## III.    INTERSTATE COMMERCE

18.    H&R Block's tax offices are in all 50 states, and those tax offices hire workers in all 50 states.[12]

---

[10] *Let's Get Started, Find a Tax Office*, H&R BLOCK, https://www.hrblock.com/tax-offices/local-offices/#!/en/office-list/Chicago,%20IL,%20USA/41.8781136/-87.62979819999998 (last visited November 11, 2018).

[11] *Let's Get Started, Find a Tax Office*, H&R BLOCK, https://www.hrblock.com/tax-offices/local-offices/#!/en/office-list/Aurora,%20IL,%20USA/41.7605849/-88.32007150000004 (last visited November 11, 2018).

[12] *A little about H&R Block*, H&R BLOCK, https://www.hrblock.com/corporate/pdfs/hrb-factsheet.pdf (last visited

19.     H&R Block's employment policies have national effect as a result of the national reach of its locations.

20.     The No-Poach Clause greatly reduced the ability of H&R Block employees to obtain higher paying or otherwise more desirable positions with H&R Block locations in other states. For example, without the No-Poach Clause, a tax preparer wanting to be promoted to office manager would be able to apply for and be considered for open office manager positions around the country, but the No-Poach Clause made this impossible, because that individual would not be considered for those positions.

21.     As a result of the above, H&R Block's anticompetitive actions had a substantial effect on interstate trade and commerce in the employment market for H&R Block employees.

## IV.     PARTIES

### A.     Plaintiff.

22.     Plaintiff Colleen Griffith is a resident of Media, Pennsylvania. Ms. Griffith was employed at an H&R Block location during the Class Period (as defined below). Defendants' anticompetitive conduct through imposing the No-Poach Clause on their franchises and corporate-owned locations and enforcing it in collusion with their franchises caused Plaintiff and other Class members to experience suppressed wages and benefits and reduced choice of locations and work options within them.

### B.     Defendants.

23.     Defendant H&R Block, Inc. (HRB) is a Missouri corporation that provides consumer tax services in the United States and certain other countries, including 10,000 retail offices in the United

---

November 11, 2018).

States that offer professional tax preparers that assist consumers in preparing tax returns. Its headquarters are at One H&R Block Way in Kansas City, Missouri. HRB has several wholly-owned subsidiaries in the United States.

24. Defendant H&R Block Tax Services LLC is a Missouri limited liability company. It is a wholly-owned subsidiary of Defendant HRB. Its headquarters are also at One H&R Block Way in Kansas City, Missouri.

### C. Unnamed Co-Conspirators.

25. H&R Block franchises and their owners are participants as co-conspirators in H&R Block's anticompetitive actions through their cooperation in the enforcement of the No-Poach Clause, and the franchise owners agreed to participate in those anticompetitive actions when they signed the franchise agreement containing the No-Poach Clause. The franchises and their owners have taken actions in furtherance of the No-Poach Clause and thereby conspired with H&R Block to suppress the wages of H&R Block employees and raise the profitability of H&R Block franchises as well as H&R Block and its corporate-owned locations. Defendants are jointly and severally liable for anticompetitive actions taken by their non-Defendant co-conspirators.

## V.   STATEMENT OF FACTS

26. H&R Block is America's largest tax services provider. In approximate numbers, H&R Block has 10,000 locations in the United States, of which 6,700 are company-owned and 3,300 are franchised; H&R Block direct employees and franchise employees prepare 12 million U.S. tax returns per year; and H&R Block has annual U.S. revenues of $3 billion, of which $2 billion comes from tax returns performed at company-owned locations, and $250 million comes from royalties

9

paid by franchises.[13]

27.     HRB receives profits from its franchises primarily through a royalty on gross revenues. Opening a new H&R Block franchise costs from approximately $30,000 to $150,000, with the variation primarily depending on the cost of the real estate and what construction is necessary.

28.     H&R Block franchises compete with one another and also compete with the locations owned directly by H&R Block.  H&R Block tells its franchisees that: "You will not receive an exclusive Franchise Territory. You may face competition from other franchisees or H&R Block tax businesses that we or our affiliates franchise or own and that operate at traditional sites outside your Franchise Territory. You may also face competition from other offices that we franchise or own, or that are franchised or owned by our Parent or affiliates, or from other channels of distribution or competitive brands we control."[14]

29.     H&R Block's franchise agreement set forth that "[t]his Agreement will establish an independent contractor relationship. . . .All employees hired by or working for Franchisee will be solely the employees of Franchisee and not employees of H&R Block or subject to H&R Block's control.  Specifically, Franchisee will have exclusive control over all employment-related decisions, including decisions concerning hiring, firing, wages, conditions of employment, discipline, staffing, or any other day-to-day management of employees.  H&R Block has no obligation or right to control any franchise employment issue."[15]

30.     The franchise agreement sets forth that the franchisees are solely responsible for the hiring, firing, management, and discipline of their employees, and establish their own wages, hours, benefit

---

[13] H&R Block, Inc., Annual Report (Form 10-K) (June 15, 2018).
[14] 2018 FDD, Item 12 – Territory.
[15] 2017 FDD, Franchise Agreement, Section 24.

10

policies, and other employment rules—but with the exception of the No-Poach Clause.

31.     According to one site, average hourly wages at H&R Block locations are $10.83 for a tax preparer, $11.83 for a tax professional, and $9.72 for a customer service representative.[16]  By contrast, the Bureau of Labor Statistics reports the national mean hourly wage for a tax preparer as $22.64.[17]

32.     While H&R Block does not set the pay scale for its franchises, and it allows franchises to set their own wages and employment policies, these low wages are the norm for almost all H&R Block employees in the United States, whether at franchises or company-owned locations.

33.     The No-Poach Clause to which H&R Block followed for its company-owned locations and required all of its franchises to agree and abide is a major reason why H&R Block wages were and are so low for H&R Block employees nationwide, in addition to causing restricted job choice and job mobility.

34.     The No-Poach Clause prevented franchises and company-owned locations from competing for employees, greatly reduced employees' ability to seek better jobs at other locations, reduced turnover, and increased locations' bargaining power relative to their employees, who could not use offers or solicitations from other locations to negotiate wage, benefit, or other improvements from their current employers.

35.     This resulted in lower wages for employees, reduced turnover, and higher profits for H&R Block, its company-owned locations, and its franchises.  Additionally, as franchises became more profitable, H&R Block's royalties from those franchises increased.

---

[16] *H&R Block Salaries in the United States*, INDEED.COM, https://www.indeed.com/cmp/H&R-Block/salaries (last visited November 11, 2018).
[17] *Occupational Employment Statistics*, BUREAU OF LABOR STATISTICS, https://www.bls.gov/oes/current/oes_nat.htm (last visited November 11, 2018).

36.    Tax preparation employees' skills, training, and work experience that they obtained at one tax preparation chain is typically chain-specific and is not valued by other tax preparation chains and other financial services companies.  H&R Block and other tax preparation chains normally require their franchises to use company-mandated computer systems and working procedures, so that experience with one company is not given credit by other companies with their own computer systems and working procedures.  This means that an employee of one tax preparation company who leaves for a different chain would often be required to start at entry-level regardless of how much experience she had at the first company.

37.    Individuals who seek to become H&R Block tax professionals are required to either take an H&R Block training course called the H&R Block Income Tax Course or pass a test certifying that they have tax knowledge comparable to the course content.  H&R Block states that the course is not open to anyone employed by or seeking to be employed by any other tax preparation company, and it does not accept certifications from other tax preparation companies.  This is a further example of how the training and experience the employees of a tax preparation chain obtain is only valued within their own company.

38.    If the labor market for H&R Block employees were competitive, H&R Block locations would compete with each other for employees by recruiting and giving offers to employees of other H&R Block locations.  Greater competition between employers, and greater transparency with respect to the pay, benefits, and working conditions of alternative jobs would lead to increased compensation for employees.

39.    H&R Block prevented this situation from becoming the reality for H&R Block employees. From at least 2009 through at least July 26, 2018, the No-Poach Clause was part of H&R Block's franchise agreement and all franchises were subject to it, in addition to being followed by company-

owned locations. As mentioned above, the No-Poach Clause read as follows:[18]

> During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent. . . .[s]olicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block;

40.     The No-Poach Clause effectively prevents individual H&R Block locations from competing for employees, including the most experienced employees, the best performing employees, or employees who would be offered a promotion at a different location, or a new or expanding location from seeking employees from worse performing locations.  Any of those scenarios would often lead to rising wages as one location would be seeking to recruit the employees in those categories, and their current employer location would raise their wages in an attempt to keep them.

41.     Individual H&R Block franchises are required to abide by the franchise agreement, and they can be terminated if they violate certain provisions of it, including the No-Poach Clause.

42.     The H&R Block employment application includes a question "Have you ever worked for H&R Block or a H&R Block Franchise affiliate?"  Applicants who answer yes to this question are then asked for their H&R Block Employee ID.  This question helps H&R Block and its franchises identify H&R Block tax office employees that are applying for positions at other H&R Block tax offices and enables them to enforce the No-Poach Clause.

43.     H&R Block's website contains an extensive section on career opportunities.[19]  However, it never mentions the No-Poach Clause, or the negative effect that the No-Poach Clause has on H&R Block employees' wages, benefits, and opportunities.

44.     The No-Poach Clause and similar agreements reduce competition for employees, which has

---

[18] 2017 FDD, Franchise Agreement, Section 12.2(A)(3)
[19] *H&R Block Careers*, H&R BLOCK, https://www.hrblock.com/corporate/career-opportunities/ (last visited November 11, 2018).

the resulting effect of reducing those employees' wages, benefits, and job mobility, and reducing turnover for the benefit of the companies and their franchise owners. This reduces employees' bargaining power both with their current employer and with other potential employers subject to the same No-Poach Clause. In the tax preparation industry, an employee's skills are usually employer-specific, and do not easily transfer to other tax preparation chains or other financial services companies, making the No-Poach Clause and similar agreements especially harmful to employees in that industry.

45. The purposes of the No-Poach Clause are to reduce turnover and suppress H&R Block employees' wages by eliminating competition between H&R Block locations for workers. Without a No-Poach Clause, franchises would raise wages to attract each other's workers, a franchise would have to raise wages and improve conditions to keep its own workers from seeking to work for other franchises, and a worker at one franchise could seek higher-paid or higher-level positions that opened up at other franchises. The No-Poach Clause greatly reduced or eliminated all of those possibilities and resulted in reducing turnover, employees' wages, benefits, working conditions, job mobility, and job choice versus what they would have been in an open market—to the benefit of H&R Block and its franchises and to the detriment of H&R Block employees.

46. The No-Poach Clause prevents H&R Block locations from competing for employees and eliminates this wage competition and other competition between locations. Since H&R Block franchises can't hire employees of other franchises or company-owned tax offices, and company-owned tax offices can't hire employees of franchises, and since H&R Block employees can't easily use their skills, training, and experience to receive comparable value with another tax preparation chain or other financial services company, H&R Block and its franchisees can suppress employee wages, benefits, and working conditions without increasing turnover, and H&R Block employees

Case 4:19-cv-00470-ODS   Document 1   Filed 11/13/18   Page 14 of 28

are denied the better wages, benefits, and working conditions that open competition would create.

47.     Economists Alan Krueger and Orley Ashenfelter describe the impact of the No-Poach Clause and similar clauses as "equivalent to a reduction in the elasticity of labor supply faced by individual franchisees and, in the usual models of monopsony (or oligopsony), reduces the wage relative to the marginal product of labor."[20]   Effectively, the No-Poach Clause and similar agreements result in reduced turnover, lower wages and worse conditions for employees, and greater profits for employers—in this case H&R Block and its franchises.

48.     Even H&R Block direct or franchise employees who did not seek employment at other H&R Block locations were harmed by the No-Poach Clause, because greater competition leads to better wages and benefits for workers in a given labor market generally (here, the market for H&R Block employees), and H&R Block locations would raise wages for their existing workers if they risked losing them to other locations.

49.     A New York Times article stated that no-poach clauses "keep employees tied to one spot, unable to switch jobs or negotiate higher pay."[21] The article also stated that "[a] lack of worker mobility has long been viewed as contributing to wage stagnation because switching jobs is one of the most reliable ways to get a raise."[22]

50.     Krueger was quoted in the article.  He studied agreements for 40 fast-food chains, and then concluded that no-poach clauses exist mainly to limit both competition and turnover, which can keep labor costs low and that they "have the potential to restrict competition and significantly

---

[20] Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018), at 9.
[21] Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html.
[22] Id.

influence pay."[23]  The same would be true in the tax preparation industry.

51.    *Antitrust Guidance for Human Resource Professionals* states that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws"[24] and "firms that compete to hire or retain employees are competitors in the employment marketplace…[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[25]

52.    The Department of Justice recently issued a statement about no-poaching agreements, stating that its "Antitrust Division continues to investigate and prosecute 'no-poach' and wage-fixing agreements" and "[w]hen companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor.  The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services.  After all, workers, like consumers, are entitled to the benefits of a competitive market."[26]

53.    The Department of Justice also stated that "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[27]

54.    The Department of Justice made clear that "naked" no-poach agreements are illegal, defining a naked agreement as one "not reasonably necessary to any separate, legitimate business

---

[23] Id.

[24] U.S. DEPT. OF JUSTICE, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download, at 3.

[25] *Id*, at 2.

[26] U.S. DEPT. OF JUSTICE, *See No More No-Poach: The Antitrust Division Continues to Investigate and Prosecute 'No-Poach' and Wage-Fixing Agreements* (April 10, 2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division- continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements.

[27] *Id*.

collaboration between the employers" and "[n]aked no-poach and wage-fixing agreements are *per se* unlawful because they eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers."[28]

55.     The Department of Justice reached a settlement with rail industry companies who had entered into no-poach agreements.[29]

56.     In January 2018, the Washington attorney general's office began investigating fast-food no-poach agreements, and then began to investigate no-poach agreements in other industries.  Other state attorneys general later joined the investigation.

57.     In July 2018, Reuters reported the investigation by the state attorneys general, and that the allegation was that fast-food companies were "using 'no-poach' rules in franchise agreements to hold down wages and limit employee advancement,"[30] and "[b]y limiting potential job opportunities, [no-poach] agreements may restrict employees ability to improve their earning potential and the economic security of their families[.]"[31]

58.     Multiple state attorneys general wrote official letters to the corporate offices of many fast-food chains wanting to know more about the no-poach provisions, and stating that no-poach agreements "limit[] potential job opportunities," "restrict employees' ability to improve their earning potential and the economic security of their families[,]" and "deprive other franchisees of the opportunity to benefit from the skills of workers" covered by such agreements.[32]

---

[28] *Id*.

[29] U.S. DEPT. OF JUSTICE, *Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreements Not to Compete for Employees* (Apr. 3,2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate- unlawful-agreements-not-compete.

[30] Diane Bartz & Alana Wise, *U.S. states probe fast-food franchise deals not to poach workers*, REUTERS (July 9, 2018), https://www.reuters.com/article/us-usa-restaurants-probe/u-s- states-probe-fast-food-franchise-deals-not-to-poach-workers-idUSKBN1JZ2NX.

[31] *Id*.

[32] Letter from Cynthia Mark, Chief, Fair Labor Div. Mass. Office of the Attorney General, *et al.*

59.     In July 2018, fast-food chains Arby's, Auntie Anne's, Buffalo Wild Wings, Carl's Jr.,

Cinnabon, Jimmy John's, and McDonalds entered into an agreement with the Washington attorney

general in which they agreed to cease using no-poach clauses in their franchise agreements.

Massachusetts attorney general Maura Healy issued a statement that no-poach agreements "unfairly

limit the freedom of fast-food and other low-wage workers to seek promotions and earn a better

living."[33]

60.     The Washington attorney general's office considered the No-Poach Clause and similar

clauses imposed by corporate chains on their own workers and their franchises' workers to be illegal

and a violation of Washington's antitrust laws, stating: "[n]o-poach provisions create a rigged

system where businesses no longer have to compete for workers, putting downward pressure on

wages nationwide. That's wrong—and illegal."[34]

61.     The Washington attorney general's office press release described how no-poach clauses hurt

workers: "[b]ecause employees cannot move to another location within their corporate brand, their

current location has less incentive to give them raises" and "economists believe that 'no-poach'

clauses reduce opportunities for low-wage workers and stagnate wages."[35]

62.     H&R Block removed the No-Poach Clause from its franchise agreement on or about July

2018.[36]

---

https://www.attorneygeneral.gov/wp-content/uploads/2018/07/2018-07-09-NPNH_Letter_Redacted.pdf (last visited
Oct. 1, 2018).

[33] Jackie Wattles, *7 fast-food chains agree to end 'no-poach' rules*, CNN MONEY (July 12, 2018),

https://money.cnn.com/2018/07/12/news/companies/no-poach-fast-food-industry-wages- attorneys-general/index.html.

[34] WASHINGTON STATE OFFICE OF THE ATTORNEY GENERAL, *AG Ferguson Secures End to No-Poach Provisions at
Eight More Restaurant Chains Nationwide*, Sept. 13, 2018, https://www.atg.wa.gov/news/news-releases/ag-ferguson-
secures-end-no-poach-provisions-eight-more-restaurant-chains.

[35] *Id*.

[36] 2018 FDD, Franchise Agreement, Section 12(A).

## VI. RELEVANT MARKET

63. Plaintiff maintains that H&R Block's anticompetitive conduct is a *per se* violation of the Sherman Act, 15 U.S.C. § 1, and therefore Plaintiff is not required to define a relevant market.

64. In the alternative, Plaintiff maintains that an observer with even a rudimentary understanding of economics could conclude that the No-Poach Clause would have an anticompetitive effect on the labor market for H&R Block tax office employees, because if the H&R Block locations who are the competitors in that labor market agree not to hire each other's employees, the wages for those employees will be suppressed versus what they would have been in an open market. Therefore, if H&R Block's conduct is deemed not to be a *per se* violation of the Sherman Act, a "quick look" analysis would apply, and Plaintiff would not be required to define a relevant market.

65. To the extent Plaintiff's claims require the definition of a relevant economic market, the relevant market is the employment market for employees of H&R Block tax offices in the United States.

66. To the extent Plaintiff's claims require the definition of a relevant geographic market, the relevant market is the United States.

67. H&R Block and its franchises, all of whom were subject to the No-Poach Clause until at least July 2018, have a market share of 100% for the employment of H&R Block tax office employees in the United States. There were no opportunities for an H&R Block tax office employee in the United States to work for an H&R Block tax office that was not subject to the No-Poach Clause.

68. Tax preparation employees' skills, training, and work experience obtained at one tax preparation chain is typically not valued by other tax preparation chains and other financial services companies. Since H&R Block and other tax preparation chains normally require their franchisees to

19

use company-specific training methods, computer systems, and working procedures, experience with one tax preparation chain is not given credit by other chains with their own training methods, computer systems, and work procedures, and an employee of one tax preparation chain who leaves for another chain would often be required to start at entry-level regardless of how much experience she had at the first chain. Therefore, employment at other tax preparation chains and other financial services companies is not an acceptable substitute for employment at H&R Block.

## VII. ANTITRUST INJURY

69. Plaintiff and members of the Class are current or former H&R Block employees.

70. H&R Block's directly-owned locations and its franchises are engaged in competition with other H&R Block franchises and H&R Block directly-owned locations for H&R Block tax office employees.

71. H&R Block and its franchisees were co-conspirators in enforcing the No-Poach Clause, and they acted to support that conspiracy when H&R Block imposed the No-Poach Clause on its franchises and took steps to enforce it against franchises that violated it, when franchises agreed not to solicit the employees of other franchises or of H&R Block company-owned locations, and when H&R Block agreed that its company-owned locations would not solicit the employees of its franchises.

72. H&R Block and its franchises intended to restrain and did in fact restrain competition in the employment market for H&R Block tax office employees by entering into the No-Poach Clause, for the intended purposes of reducing turnover and wage and non-wage competition between H&R Block locations, thereby suppressing employee wages, benefits, and job choice, making H&R Block and its franchises more profitable at their employees' expense.

73. H&R Block's anticompetitive actions had a significant impact on interstate commerce in the

employment market for H&R Block's tax office employees. H&R Block's actions had national impact on that market.

74.     The No-Poach Clause deprived H&R Block employees of access to the higher wages, better benefits and working conditions, and greater job choice and mobility that free and open competition would have created for them. This affected not only employees who sought positions at other H&R Block locations, but also affected employees who did not seek other positions, because a franchise faced with competition for its own workers would often raise their wages and improve their benefits and working conditions to encourage them to stay.

75.     Therefore, H&R Block's anticompetitive actions had the proximate and foreseeable result of injuring the wages of Plaintiff and other members of the Class.

76.     If not for H&R Block's anticompetitive actions through its use of and enforcement of the No-Poach Clause, Plaintiff and other members of the Class would have received higher wages, better benefits and working conditions, and greater job choice and mobility.

77.     The suppression of wages and other non-wage benefits and job mobility that Plaintiff and other Class members sustained is the type of injury that the antitrust laws were intended to prevent and make illegal, and it was the direct result of H&R Block's anticompetitive actions through imposing and enforcing the No-Poach Clause on its franchises and company-owned locations.

78.     H&R Block's anticompetitive actions had no legitimate business justification and did not have any pro-competitive benefits.

79.     H&R Block is jointly and severally liable for the acts of non-Defendant co-conspirator franchises and their owners.

80.     H&R Block therefore caused antitrust injury to Plaintiff and other members of the Class.

## VIII.   FRAUDULENT CONCEALMENT AND STATUTE OF LIMITATIONS

81.     H&R Block concealed the conspiracy from Plaintiff and other members of the Class.  The No-Poach Clause was not disclosed to Plaintiff or other H&R Block employees, and they could not have reasonably discovered it.

82.     Plaintiff and other members of the Class did not have access to information that would have alerted them to the possibility of the conspiracy between H&R Block and its franchises.

83.     H&R Block's company-owned locations and franchises both represented to their employees that they were in compliance with the law and that the wages being offered were determined fairly through competition in a free and open market.  Plaintiff and other members of the Class could not have reasonably determined that this was false based on information available to them, especially in light of H&R Block's and its franchises' efforts to conceal their anticompetitive actions from franchise employees and members of the public.

84.     When an H&R Block franchise employee applied for a job at another H&R Block franchise or a company-owned location, that employee would simply not receive a job offer.  The employee was never informed that the No-Poach Clause was preventing her from getting that other position.

85.     H&R Block and its franchises intended to, and did in fact, conceal evidence of the No-Poach Clause and its effects in suppressing wage and non-wage competition from H&R Block tax office employees.

86.     Plaintiff and other members of the Class relied, reasonably, on statements by H&R Block and its franchises that they were in compliance with the law, and that the wages being offered were determined in a free and open market.

87.     In light of the above, H&R Block's knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop

22

Defendants from using any statute of limitations defense in this action.

## IX. CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to

Fed. R. Civ. P. 23 as representative of a Class defined as follows:

> All persons in the United States who worked for an H&R Block tax office in the United States, whether company-owned or franchised, at any time from January 1, 2009 onwards until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

> Excluded from the Class are Defendants' officers and directors, H&R Block franchise owners, any employees of any Defendant who worked for that Defendant in a capacity other than as a tax office employee of an H&R Block location directly-owned by a Defendant or its subsidiary, Defendants' counsel, and employees of the U.S. District Court for the Northern District of Illinois, and all immediate family members of any of those excluded individuals.

89.    Plaintiff reserves the right to amend the Class definition and to add subclasses.

90.    The number of members of the Class is so large and numerous as to make joinder of all

potential Class members impracticable.  There are approximately ten thousand H&R Block tax

offices in the United States, and each one would likely have at least ten employees during tax season

and many more employees from past tax seasons, meaning that there are at least tens of thousands of

proposed members of the Class throughout the United States.

91.    There are numerous questions of law and fact that are common to the Class and that

predominate over any issues affecting individual members of the Class, including, *inter alia*:

   A.  Whether H&R Block imposed the No-Poach Clause on its franchises;

   B.  Whether H&R Block imposed the No-Poach Clause on its company-owned locations;

   C.  Whether H&R Block enforced the No-Poach Clause on its franchises who sought to hire

   or solicit employees of other franchises or of company-owned locations;

   D.  Whether H&R Block enforced the No-Poach Clause on its company-owned locations who

23

sought to hire or solicit employees of its franchisees;

E.  When H&R Block first included the No-Poach Clause in its franchise agreements;

F.  How the No-Poach Clause was enforced;

G.  Whether, and by how much, the conduct alleged herein suppressed the wages, benefits, working conditions, and job mobility of H&R Block's and its franchises' employees;

H.  Whether H&R Block and its franchises intended to suppress the wages, benefits, working conditions, and job mobility of H&R Block employees through the No-Poach Clause;

I.  What effect the No-Poach Clause had on Defendants' and their franchises' profits;

J.  Whether the conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

K.  Whether the conduct alleged herein was an unreasonable restraint of trade;

L.  Whether the conduct alleged herein was a *per se* violation of the federal antitrust laws;

M.  The operative time period and extent of Defendants' violations;

N.  Whether H&R Block and its franchises fraudulently concealed their conduct;

O.  Whether Plaintiff and the Class could reasonably have known about the no-poach conspiracy prior to its public announcement;

P.  The proper measure of damages for the Class; and

Q.  The appropriate injunctive and equitable relief for the Class.

92.     Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that she can fairly and adequately represent their interests.

93.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

94.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and

24

efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly-situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

95.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Fed. R. Civ. P. 23.

## COUNT ONE
### Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

96.     Plaintiff repeats and reiterates each of the allegations set forth in paragraphs 1-95 as if fully set forth herein.

97.     Since the conduct alleged herein is *per se* illegal or evaluated under the "quick look" analysis, Plaintiff is not required to define a relevant market.

98.     In the alternative, if Plaintiffs are required to define a relevant market, the relevant economic market is the employment market for employees of H&R Block tax offices in the United States, whether company-owned or franchised, and the relevant geographic market is the United States.

99.     H&R Block imposed the No-Poach Clause on its company-owned tax offices and its franchises, and then enforced the No-Poach Clause on them, in collusion with them, thereby restricting competition in the labor market for H&R Block tax office employees to their detriment, suppressing their wages, benefits, working conditions, and job mobility.

100.    This collusion between H&R Block and its franchises was an unreasonable restraint of trade and violated federal antitrust law.

101.    H&R Block's imposition and enforcement of the No-Poach Clause was intended to, and did in fact, suppress wage and non-wage competition, turnover, and job mobility for H&R Block tax

office employees, resulting in H&R Block tax office employees having artificially low wages, fewer benefits, worse working conditions, and reduced choice and mobility as to job and work location.

102. H&R Block and its franchises engaged in this collusion in order to increase the profits of H&R Block and its franchises, and they did in fact increase their profits through reducing turnover, suppressing wages and wage growth, providing fewer benefits and worse working conditions, and being able to exploit workers whose mobility within the company was greatly reduced or eliminated.

103. The direct, foreseeable, intended, and proximate result of H&R Block's actions was the suppression of wages, benefits, working conditions, and job mobility for H&R Block's tax office employees.

104. There is no legitimate pro-competitive justification for H&R Block's actions, and even if there was, there would be a less restrictive alternative way to achieve it.

105. As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

106. Plaintiff and the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

107. Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiff hereby respectfully requests:**

A. That the Court determine that Plaintiff's claim alleged herein is suitable for class treatment, and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

B. That the Court appoint Plaintiff as the representative of the Class;

C.  That Plaintiff's counsel be appointed as counsel for the Class;

D.  That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

E.  That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

F.  That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorneys' fees in bringing this action;

G.  That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

H.  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues triable to a jury in this action.

Dated:  November 13, 2018     Respectfully submitted,

          */s/ Mark R. Miller*
          Kenneth A. Wexler
          Mark R. Miller
          **WEXLER WALLACE LLP**
          55 West Monroe St., Suite 3300
          Chicago, IL 60603
          Tel: (312) 346-2222
          Email: kaw@wexlerwallace.com
            mrm@wexlerwallace.com

          John Radice (PHV forthcoming)
          Daniel Rubenstein (PHV forthcoming)
          April Lambert (IL bar #6288845)
          Natasha Fernandez-Silber (PHV forthcoming)
          Rishi Raithatha (PHV forthcoming)

27

**RADICE LAW FIRM, P.C.**
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502
Fax: (609) 385-0745
Email: jradice@radicelawfirm.com
      drubenstein@radicelawfirm.com
      alambert@radicelawfirm.com
      nsilber@radicelawfirm.com
      rraithatha@radicelawfirm.com

Eric L. Young (PHV forthcoming)
Paul V. Shehadi (PHV forthcoming)
**McELDREW YOUNG, Attorneys-at-Law**
123 S. Broad Street, Suite 2250
Philadelphia, PA 19109
Phone: (215) 367-5151
Fax: (215) 367-5143
Email: eyoung@mceldrewyoung.com
      paul@mceldrewyoung.com

*Attorneys for Plaintiff Colleen Griffith and the
proposed Class*